Norman HARTNESS, et al., Plaintiffs,

v.

George BUSH, et al., Defendants.

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
AFL–CIO, et al., Plaintiffs,

v.

Richard AUSTIN, Administrator, General Services Administration, Defendant.

The Hon. Vincent A. LaBELLA, et al., Plaintiffs,

v.

Richard AUSTIN, Administrator, General Services Administration, et al., Defendants.

Civ. A. Nos. 89–044–LFO, 89–0950–LFO and 89–1152–LFO.

United States District Court,
District of Columbia.

May 19, 1989.
On Motion to Modify May 23, 1989.

Jeffrey F. Liss, Benjamin S. Boyd, and Piper & Marbury, Washington, D.C., for Norman Hartness, et al. (Arthur B. Spitzer and Elizabeth Symonds, ACLU, Washington, D.C., of counsel).

Richard Hertling, Atty., Dept. of Justice Federal Programs Branch, Washington, D.C., for George Bush, et al.

Anne Wagner, AFGE, Washington, D.C., for American Federation of Government Employees, AFL–CIO, et al.

Richard G. Lepley, Atty., Dept. of Justice, Washington, D.C., for Richard Austin.

Nicholas T. Christakos, Sheila J. Carpenter, and Sutherland, Asbill & Brennan, Washington, D.C., for Vincent A. LaBella, et al. (Arthur B. Spitzer and Elizabeth Symonds, ACLU, Washington, D.C., of counsel).

MEMORANDUM

OBERDORFER, District Judge.

I.

Various civilian employees of the federal government and a labor union have sued to

enjoin government testing of employees' urine now scheduled to begin on or after May 24, 1989. Three cases brought by or on behalf of employees in the Executive Office of the President ("EOP"), *Hartness v. Bush,* and in the General Services Administration ("GSA"), *AFGE v. Austin* and *LaBella v. Austin,* are now before the Court on motions for preliminary injunction pending a decision on the merits.

The defendants in these cases adopted the plans at issue in obedience to Executive Order No. 12,564 issued September 15, 1986. The preamble to the Order noted the serious adverse effects of drug use upon the national work force, the resulting loss of productivity, the federal government's concern for the well-being of its employees, its concern for successful accomplishment of agency missions, and the need to maintain employee productivity. In addition, the Order stated that:

> The federal government, as the largest employer in the Nation, can and should show the way towards achieving drug-free workplaces through a program designed to afford drug users a helping hand and, at the same time, demonstrating to drug users and potential drug users that drugs will not be tolerated in the Federal workplace.[1]

There was also reference to public safety, effective law enforcement, crime and violence generated by commerce in illegal drugs, and the deleterious effect of drugs on federal employees' reliability and good judgment that is inconsistent with access to sensitive information and creates the possibility of irresponsible action posing a serious risk to national security. For these reasons, the Executive Order barred drug use by federal employees on duty and off duty and charged each agency with responsibility for developing a plan for achieving "the objective of a drug-free workplace with due consideration of the rights of the government, the employee, and the general public."[2]

More specifically, for purposes of the pending motion, the Executive Order directed each agency to "establish a program to test for the use of illegal drugs by employees in sensitive positions."[3] In addition, it authorized the testing of an employee "[w]hen there is a reasonable suspicion that [the] employee uses illegal drugs."[4]

Pursuant to that Order, the EOP plan authorizes random testing of all employees in designated "sensitive positions," including personnel at the Office of Management and Budget, the Office of the United States Trade Representative, and the Office of Administration. With respect to the 30 named plaintiffs in *Hartness v. Bush,* none of these EOP personnel has a White House pass.[5] Furthermore, there is no indication in the record that any of the named plaintiffs would have unguarded access to the President or the Vice President. All of them are subjected to thorough security checks by the Federal Bureau of Investigation before they are appointed. All involved in this case generally operate under close supervision in a conventional government office environment.

The record in *Hartness v. Bush* reveals that there were reported to be five drug abuse problems involving an EOP employ-

---

1. Executive Order 12,564, Exhibit 14 to Appendix to Statement of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction in *Hartness v. Bush* at 1.

2. *Id.* at Section 2(a).

3. *Id.* at Section 3(a).

4. *Id.* at Section 3(c)(1).

5. Plaintiffs' Proposed Findings of Fact and Conclusions of Law in *Hartness v. Bush* at 9; Defendants' Proposed Findings of Fact and Conclusions of Law in *Hartness v. Bush* at 14.

A White House pass, issued by the Secret Service, permits access to the entire White House Complex, including the East and West Wings of the White House. The two other kinds of passes issued by the Secret Service, the Old Executive Office Building ("OEOB") Pass and the New Executive Office Building ("NEOB") Pass, do not permit access to the Executive Mansion, including the East and West Wings, but only permit access to the OEOB, the NEOB, and the Winder Building. Declaration of Charles Easley, Exhibit B to Defendants' Memorandum in Opposition to a Preliminary Injunction in *Hartness v. Bush* at 3–4.

ee in the last 40 months.[6] There is no evidence in the record that there has ever been a case of bribery, any compromise of classified documents or other national security information, or any other serious misbehavior by any EOP employee. Nor is there any evidence of any accident, serious or otherwise, for which an EOP employee has been held responsible. Affidavits filed by a sampling of 8 EOP plaintiffs indicate that none has a security clearance that would enable him or her access to information related to sensitive military secrets or plans, or strategic national security issues.[7]

The GSA plan authorizes random testing of employees in designated sensitive and safety-related positions. The plan defines employees in sensitive positions to include positions defined as sensitive under Chapter 731 of the Federal Personnel Manual, an employee granted or who may be granted access to classified information, presidential appointees, law enforcement officers, and "other positions that involve law enforcement, national security, the protection of life and property, public health or safety, or other functions requiring a high degree of trust and confidence."[8] However, counsel for defendants in the *AFGE v. Austin* case represented at oral argument on the pending motion that GSA intends to defer testing of certain designated positions, including elevator mechanics, automotive workers, and fire protection engineers. GSA employees in non-deferred testing designated positions are Physical Security Specialists, Federal Protective Officers, Police Officers, Detectives, Protection Specialists, Security Guards, Training Instructors, Communication Equipment Operators, Firefighters, and Motor Vehicle Operators. At oral argument counsel for GSA conceded that although the police officers designated for urine testing carry weapons, they are seldom used, and there is no record of their being misused. Moreover, police are routinely inspected and instructed by supervisors at daily roll calls.

Testing designated positions challenged by the three named plaintiffs in the *LaBella v. Austin* case are Presidential Appointees/senior level managerial positions/Administrative Judges, Criminal Investigators, Personnel Security Specialists and Security Specialists, Employee and Labor Relations Specialists, Civil Engineer/Construction Representative, National Security Emergency Preparedness Staff/Information Security Division, and Office of Information Security Oversight.[9]

With respect to drug testing at the GSA, according to a GSA Order issued September 9, 1988, "the overwhelming majority of GSA employees have never had trouble with illegal drugs."[10] There is no evidence in the record that GSA made any systematic study of drug use or its consequences. GSA has approximately 20,000 employees. According to a declaration by the official responsible for implementation of the GSA drug control plan, while the absence of systematic urine testing has limited the information about employee drug abuse, he was able to list only twenty-two cases over a five-year period in which GSA has taken disciplinary and performance based actions relating to drug use.[11] In only three of

6. Defendants' Responses to Plaintiffs' Interrogatories and Requests for Production of Documents in *Hartness v. Bush,* filed May 8, 1989.

7. Supplemental Exhibits to Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction in *Hartness v. Bush,* filed May 12, 1989.

8. General Services Administration Plan to Implement Executive Plan 12,564, Exhibit A to Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction in *AFGE v. Austin* at 5–6.

9. Defendants' Proposed Findings of Fact and Conclusions of Law in *LaBella v. Austin* at 7–10.

10. Exhibit B to Exhibits to the Memorandum of Points and Authorities in Support of Plaintiffs' Application for a Preliminary Injunction in *LaBella v. Austin* at 1.

11. The employees involved included a motor vehicle operator (who resigned), an insulator, a painter, a program clerk, a contract administrator, an accounting technician, a high voltage electrician, a physical security specialist, a warehouse worker, two federal protective officers, an automotive equipment repair inspector, a secretary and realty assistant, two clerk typists, a custodial worker, a procurement clerk, an air conditioning equipment mechanic, a position classification specialist, a financial management specialist, a staff assistant, and a management

these cases had the employee been arrested or convicted of a drug related crime. There is no indication that GSA has brought any of the twenty-two cases or any other case of drug abuse by a GSA employee to the attention of law enforcement officials. Furthermore, there was no report of a drug related accident or that accidents were a serious GSA employee problem. Nor was there any reported case of drug related bribery. Moreover, there is no evidence in the record that GSA's mission is in any way connected to drug interdiction, or that anyone at GSA is personally involved in the interdiction of illegal drugs.

The GSA plan also authorizes reasonable suspicion testing of any employee suspected of using illegal drugs on duty or off duty. The plan identifies a non-inclusive list of factors upon which reasonable suspicion of illegal drug use may be based: (1) observable phenomena, such as direct observation of drug use or possession and/or the physical symptoms of being under the influence of a drug; (2) a pattern of abnormal conduct or erratic behavior; (3) arrest or conviction for a drug-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug possession, use, or trafficking; (4) information provided either by reliable and credible sources or independently corroborated; or (5) newly discovered evidence that the employee has tampered with a previous drug test.[12]

Initial responsibility for determining reasonable suspicion rests with supervisors, who are charged with gathering all information, facts and circumstances leading to and supporting their suspicion, and who must then obtain the concurrence of the next level supervisor in making the finding that a reasonable suspicion of illegal drug use exists. An appropriate supervisor will then promptly prepare a written record detailing the circumstances that formed the basis for the determination of reasonable suspicion, including the dates and times of reported drug related incidents, reliable sources of information, the rationale leading to the test, findings of the test, and the action taken. The GSA plan also provides that supervisors will be trained to address illegal drug use by employees, to recognize facts that give rise to a reasonable suspicion, and to document facts and circumstances to support a finding of reasonable suspicion. Failure to receive such training, however, "shall not invalidate otherwise proper reasonable suspicion testing."[13]

It is estimated that the GSA plan will subject approximately 2,360 GSA employees to random testing.[14] All 20,000 GSA employees are at risk of being tested if GSA has what it describes as a reasonable suspicion of drug use by the employees.

## II.

In the time since the Executive Order was issued and the agency plans adopted, there have been significant Fourth Amendment jurisprudence developments applicable to these cases. Several judges on this District Court have enjoined implementation of agency plans adopted in response to the Executive Order, including plans issued by the Department of Justice, the Department of the Army, the Department of the Interior, and the Department of Agriculture, and in two cases judges have denied preliminary injunction applications by air traffic controllers and other Department of Transportation employees, and by members of the Uniformed Division of the United States Secret Service; three of these cases have been briefed and argued and are awaiting decisions in our

---

assistant. Declaration of Paul T. Weiss, Exhibit D to Memorandum of Points and Authorities in Support of Plaintiffs' Application for a Preliminary Injunction in *AFGE v. Austin* at ¶ 19.

**12.** *See supra* note 8 at 25.

**13.** *Id.* at 26.

**14.** Defendants represent that because GSA has voluntarily delayed random testing of some cat-

egories of testing designated positions, including General Supply Officers/Supply System Analyst of the Automotive, Furniture, Office and Scientific Equipment and Tools Commodity Centers, fewer employees are subject to immediate testing. Declaration of Paul T. Weiss, *supra* note 11 at ¶¶ 8, 12; representation by counsel for defendants in *LaBella v. Austin* during oral argument.

Court of Appeals.[15] More important, since these plans now at issue were adopted, the Supreme Court has announced its decisions in *Skinner v. Railway Labor Executives' Association,* — U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National Treasury Employees v. Von Raab,* — U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and has remanded for reconsideration by our Court of Appeals its decision approving the urine testing of District of Columbia school bus attendants in the course of required annual medical examinations.[16]

*Skinner* and *Von Raab* tend to confirm the earlier decisions by judges of this Court that several plans for random urine testing of government employees are impermissibly broad and imprecise. Yet, except for a temporary litigation concession by GSA, neither defendant in the cases now before this Court has adjusted its testing plan to reflect any realistic response to what appears to be a clear message from the Supreme Court.

In *Skinner,* a divided court held that "surpassing safety interests" justified mandatory, after-accident testing of railroad crews.[17] The Federal Railroad Administration found that "the nation's railroads experienced at least 21 significant train accidents involving alcohol or drug use as a probable cause or contributing factor" and that these accidents "resulted in 25 fatalities, 61 non-fatal injuries, and property damage estimated at $19 million." [18] The agency further identified "an additional 17 fatalities to operating employees working on or around rail rolling stock that involved alcohol or drugs as a contributing factor." [19] The level of the "safety interests" that justifies exposing a person to the indignity of a urine test may be measured by the Supreme Court's approving quotation of the dissenter below, who wrote:

> An idle locomotive, sitting in the roundhouse, is harmless. It becomes lethal when operated negligently by persons who are under the influence of alcohol or drugs.[20]

The five to four decision in *Von Raab* approved the testing of armed Customs Service officers engaged in front-line drug interdiction who were applicants for promotion and who could protect themselves from testing by the simple expedient of declining promotion. The Court there reasoned that "the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment," [21] and that "Customs employees who are directly involved in the interdiction of illegal drugs or who are required to carry firearms in the line of duty ... have a diminished expectation of privacy." [22] The Court drew a clear distinction between these employees and "most private citizens

---

15. *Harmon v. Meese,* 690 F.Supp. 65 (D.D.C. 1988), *appeal docketed,* No. 88–5265 (D.C.Cir. Aug. 11, 1988); *National Federation of Federal Employees v. Carlucci,* 680 F.Supp. 416 (D.D.C. 1988), *appeal docketed,* No. 88–5080 (D.C.Cir. Mar. 16, 1988); *American Federation of Government Employees v. Dole,* 670 F.Supp. 445 (D.D.C. 1987), *appeal docketed,* No. 87–5417 (D.C.Cir. Dec. 11, 1987); *Bangert v. Hodel,* 705 F.Supp. 643 (D.D.C.1989) (Greene, J.); *Uniformed Division Officers Ass'n v. Brady,* No. 88–3377, 1988 WL 142378 (D.D.C. Dec. 23, 1988) (Flannery, J.); *National Treasury Employees Union v. Lyng,* 706 F.Supp. 934 (D.D.C.1988) (Flannery, J.); *National Federation of Federal Employees v. Carlucci,* 690 F.Supp. 46 (D.D.C.1988).

16. *Jones v. McKenzie,* 628 F.Supp. 1500 (D.D.C. 1986), 833 F.2d 335 (D.C.Cir.1987), *vacated and remanded sub nom. Jenkins v. Jones,* — U.S. ——, 109 S.Ct. 1633, 104 L.Ed.2d 149 (April 4, 1989). The record there included evidence of "repeated incidents of bizarre or drug-related behavior by drivers or attendants while on duty; syringes and bloody needles ... found in restrooms used by Transportation Branch employees; and [an estimation by] the head of the Branch 'that 60% of the employees assigned to the Transportation Branch are using narcotics to some extent.'" 833 F.2d at 336 (citations omitted). Pending its reconsideration, the Court of Appeals has ordered counsel to file supplemental briefs.

17. *Skinner,* 109 S.Ct. at 1422.

18. *Id.,* 109 S.Ct. at 1407–08.

19. *Id.* at 1408.

20. *Id.* at 1419.

21. *Von Raab,* 109 S.Ct. at 1393.

22. *Id.,* 109 S.Ct. at 1394.

or government employees in general." [23] Nevertheless, the *Von Raab* opinion concluded that "the suspicionless testing of employees who apply for promotion to positions directly involving the interdiction of illegal drugs, or to positions which require the incumbent to carry a firearm, is reasonable." [24]

Moreover, while *Skinner* and *Von Raab* abandoned any requirement for particularized, individualized suspicion as a predicate for random testing, the fact bound opinions require substantial *generalized* suspicion. The Supreme Court placed heavy emphasis in *Skinner* on the many drug related railway accidents shown on the record as justification for the narrowly focussed testing plan authorized there, and in *Von Raab* on the front-line drug interdiction mission of armed Customs Service officers directly confronted with the risk of bribery attempts and violence in the course of their daily work and who functioned so aggressively against drug traffickers as to have seized several billion dollars of drugs each year.

The narrow scope of the license granted to the government to engage in large scale urine testing is evidenced by the Supreme Court's skepticism about the breadth of the Customs Service testing program applicable to Customs employees required to handle classified material. The Court questioned "whether the [Customs] Service has defined this category of employees more broadly than necessary to meet the purposes of the Commissioner's directive." [25] The level of compelling national security interest contemplated by the *Von Raab* court as a requisite for limiting access to certain classified material to urine-tested employees may be perceived by reference to the cases that the Court chose to cite. In support of its recognition that "the Government has a compelling interest in protecting *truly sensitive information* from those who, 'under compulsion of circumstances or for other reasons, ... might compromise [such] information,'" [26] the majority cited *Department of the Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988) (Blackmun, J.). In the *Egan* case, the Court ruled, over the dissents of Justices White, Brennan and Marshall, that the Merit Systems Protection Board lacked authority to review the merits of a decision of the Navy that refused security clearance to a civilian employee at the Trident Naval Refit Facility in Bremerton, Washington. Justice Blackmun's opinion for the majority noted:

> The mission of the Refit Facility is to provide quick-turn-around repair, replenishment, and systems check-out of the Trident submarine over its extended operating cycle. The Trident is nuclear-powered and carries nuclear weapons. It has been described as the most sophisticated and sensitive weapon in the Navy's arsenal and as playing a crucial part in our Nation's defense system.... As a consequence, *all* employee positions at the Refit Facility are classified as sensitive.[27]

The Director of the Naval Civilian Personnel Command withdrew Egan's security clearance to work on the Trident as a machinist. According to Justice Blackmun:

> This was based upon California and Washington state criminal records reflecting respondent's convictions for assault and for being a felon in possession of a gun, and further based upon his failure to disclose on his application for federal employment two earlier convictions for carrying a loaded firearm. The Navy also referred to respondent's own statements that he had had drinking problems in the past and had served the final 28 days of a sentence in an alcohol rehabilitation program.[28]

In defining the task of the lower courts on the remand of *Von Raab,* the Supreme

23. *Id.*

24. *Id.* at 1397.

25. *Id.*

26. *Id.,* 109 S.Ct. at 1396 (emphasis added).

27. *Egan,* 484 U.S. 518, 108 S.Ct. 818, 820, 98 L.Ed.2d 918 (1988).

28. *Id.,* 108 S.Ct. at 821.

Court also cited *United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). In that case, Chief Justice Warren held unconstitutional a section of the Subversive Activities Control Act of 1950 [29] making it unlawful for a member of the Communist-action organization to work in any defense facility. The plaintiff in that case was a member of the Communist Party employed as a machinist at the Todd Shipyards Corporation in Seattle, Washington. While as quoted in *Von Raab*, the *Robel* Court "recognized that ... the Constitution ... does not withdraw from the Government the power to safeguard its vital interests," [30] the law in question was fatally overbroad because it sought to

> bar employment both for association which may be proscribed and for association which may not be proscribed consistently with First Amendment rights.[31]

Said Chief Justice Warren,

> For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties—the freedom of association—which makes the defense of the Nation worthwhile.[32]

My reading of these cases persuades me that the *Von Raab* majority, which includes Justices Blackmun and O'Connor, but not Justice Scalia, would disapprove of the mandatory random testing of the urine of the broad range of unarmed employees now slated for testing by the GSA and the EOP. Evidence in the record with respect to the named plaintiffs in the *Hartness v. Bush* case and the eleven categories of GSA employees now scheduled for testing

in the *LaBella v. Austin* case is inadequate to support the reasonableness of the search there at issue. With respect to the testing at issue in *AFGE v. Austin*, it may be that most, if not all, of the GSA employees who carry firearms in the line of duty do not and will not use them, and that when their several roles can be spelled out in consideration of the merits, testing will be found to be overkill. But a misused firearm, like a misused locomotive, can be lethal. At this stage of this proceeding, with regard to the management of firearms it is better to be safe than sorry.

■ As to reasonable suspicion testing, the decision of other judges in this Circuit who have upheld reasonable suspicion testing but have decided that it must be conducted under circumstances exhibiting individualized suspicion of on the job impairment and with evidence of substantial reliability is entitled to great respect.[33] However, there is no showing here of imminent danger that would justify commencement of reasonable suspicion testing pending a decision on the merits, at least until the GSA plan is revised to provide that such testing is based upon reasonable, articulable, and individualized suspicion of use of drugs on duty or off duty, causing a reasonable suspicion that a specific employee may be under the influence of drugs while on duty.

■ Plaintiffs in the *Hartness v. Bush* case raise the additional point that the EOP plan indirectly violates the Administrative Procedures Act ("APA") because it explicitly relies on the Office of Personnel Management Federal Personnel Manual Letter 792–16 (Nov. 28, 1986) ("FPM Letter") as guidance, a Letter which itself is invalid because it was issued without notice and comment, in violation of the APA.[34]

---

**29.** § 5(a)(1)(D), 50 U.S.C. § 784(a)(1)(D).

**30.** *Von Raab*, 109 S.Ct. at 1396.

**31.** *Robel*, 389 U.S. 258, 266, 88 S.Ct. 419, 425, 19 L.Ed.2d 508 (1967).

**32.** *Id.* at 264, 88 S.Ct. at 423.

**33.** *See Bangert v. Hodel*, 705 F.Supp. 643 (D.D.C. 1989) (Greene, J.); *National Treasury Employees Union v. Lyng*, 706 F.Supp. 934 (D.D.C.1988) (Flannery, J.).

**34.** Plaintiffs' Supplemental Brief Regarding Application of the Administrative Procedure Act Rulemaking Requirements to the EOP Plan in *Hartness v. Bush* at 2–3, citing *National Treasury Employees Union v. Reagan*, 685 F.Supp. 1346, 1355–56 (E.D. La.1988), *appeal docketed*, No. 88–3770 (Oct. 27, 1988).

The EOP plan and the GSA plan explicitly state that they use the FPM Letter as guidance.[35] Although the issue of the APA was raised by the Court and was briefed by counsel in the *Hartness v. Bush* case only after oral argument, this issue nevertheless presents an additional ground on which plaintiffs may prevail on the merits.

In any event, applying the traditional standards for issuance of a preliminary injunction set forth in *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977), and *Population Institute v. McPherson*, 797 F.2d 1062, 1078 (D.C.Cir.1986), I am not persuaded on this record that the government will prevail on the merits of its claim that it has a compelling interest in the testing of the several hundred employees, including or potentially represented by plaintiffs, that justifies violation of their undisputed expectations of privacy with respect to their elimination functions. These employees, individually and collectively, may be presumed to be civilized men and women, no one of whom should be subjected to supervised elimination on a record such as this. Nor has the government demonstrated how postponement of commencement of testing of these plaintiffs, at least until their counsel and the Court has the benefit of our Court of Appeals' hopefully imminent rulings on the closely related decisions of other judges of this Court, will harm or injure the defendants or the public interest that they represent. There is a plain public interest in the protection of the Fourth Amendment privacy interest of each of the employees who might be tested now only to find that Supreme Court and Court of Appeals' decisions would have precluded the intrusion if the testers had had the benefit of them.

Accordingly, until these cases can be decided on the merits, an accompanying order will enjoin implementation of the mandatory random testing of the named plaintiffs in the *Hartness v. Bush* case, the eleven categories of GSA employees now sched-

uled for testing in the *LaBella v. Austin* case, and unarmed employees occupying non-deferred testing designated positions in the *AFGE v. Austin* case, and will enjoin reasonable suspicion drug testing of any GSA employee, unless or until the GSA drug testing plan is revised as provided therein.

## ORDER

It is likely that there will be a declaration on the merits in *Hartness v. Bush*, No. 89–0044, and *LaBella v. Austin*, No. 89–1152, that there is no national security or public safety interest in the testing of the named plaintiffs in *Hartness* or of the eleven categories of General Services Administration employees now scheduled for random drug testing sufficient to overcome the universal and obvious privacy expectations of those persons. It is also likely that there will be a declaration on the merits in those cases that the criteria used by defendants to select those persons for testing do not identify with sufficient precision the government's "vital interests" that would be protected by testing them or the extent, if any, that the proposed testing would enhance the safeguarding of any vital interests over that now accomplished by existing security procedures and continuing supervision.

However, the Supreme Court's holding in *National Treasury Employees' Union v. Von Raab*, —— U.S. ——, 109 S.Ct. 1384, 1396–97, 103 L.Ed.2d 685 (1989), regarding "the suspicionless testing of employees who apply for promotion ... to positions which require the incumbent to carry a firearm" will likely lead to a declaration in *AFGE v. Austin*, No. 89–0950, that it is not unreasonable for the defendants to subject to random testing any incumbent employee required to carry a firearm in the course of his or her duty. The risk of firearm abuse is omnipresent, and the privacy expectation of those plaintiffs who carry firearms in the line of duty is relatively attenuated.

---

**35.** Executive Office of the President Drug–Free Workplace Plan, Exhibit 15 to Plaintiffs' Appendix to Statement of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction in *Hartness v. Bush* at 4; General Services Administration Plan to Implement Executive Plan 12,564, *supra* note 8 at 4.

Finally, as explained by Judge Flannery in *National Treasury Employees Union v. Lyng*, 706 F.Supp. 934 (1988), and Judge Greene in *Bangert v. Hodel*, 705 F.Supp. 643 (D.C.Cir.1989), the absence of any reasonable suspicion of work related drug use or impairment will probably result in a declaration on the merits that the reasonable suspicion element of the GSA plan cannot pass constitutional muster, unless and until it is revised as provided herein.

Accordingly, for the foregoing reasons and for reasons stated in the accompanying Memorandum, and upon consideration of plaintiffs' motions for preliminary injunction, the memoranda and exhibits submitted in support thereof and in opposition thereto, supplemental briefings, and extensive oral arguments on May 11 and May 12, 1989, (a transcript of which will be filed), it is this 19th day of May, 1989, hereby

ORDERED: that the motions for preliminary injunction in *Hartness v. Bush*, No. 89–0044, and *LaBella v. Austin*, No. 89–1152, are hereby granted; and it is further

ORDERED: that the motion for preliminary injunction in *AFGE v. Austin*, No. 89–0950, is hereby granted in part and denied in part; and it is further

ORDERED: that, pending a decision on the merits, defendants in *Hartness v. Bush* are hereby enjoined from conducting the proposed random testing of the named plaintiffs who do not hold or acquire a White House pass, as defined in the accompanying Memorandum at footnote 5; and it is further

ORDERED: that, pending a decision on the merits, defendants in *AFGE v. Austin* and *LaBella v. Austin* [hereinafter GSA defendants] are hereby enjoined from conducting the proposed random testing of all persons represented by plaintiffs in *AFGE* who are now scheduled for testing and who do not carry firearms in the course of their duties, and all persons in the eleven categories now scheduled for testing in *LaBella;* and it is further

ORDERED: that, pending a decision on the merits, the GSA defendants are hereby enjoined from conducting reasonable suspicion testing of any GSA employee, unless or until the GSA drug testing plan is revised to provide that such testing is based upon reasonable, articulable, and individualized suspicion of use of drugs on duty or off duty, causing a reasonable suspicion that a specific employee may be under the influence of drugs while on duty.

## ORDER ON MOTION TO MODIFY

Upon consideration of Defendants' Motion To Modify Scope of Preliminary Injunction and in light of plaintiffs' recognition that they lack standing to represent General Services Administration employees that carry firearms such as "criminal investigators," it is hereby

ORDERED that defendants' Motion is granted and that the preliminary injunction entered in this matter on May 19, 1989 is modified to exclude from its coverage employees at the General Services Administration who occupy the position of "criminal investigator."