**NATIONAL TREASURY EMPLOYEES UNION, Plaintiff,**

v.

**James D. WATKINS, Secretary of Energy, Defendant.**

**Civ. A. No. 89–1006.**

United States District Court, District of Columbia.

June 16, 1989.

Elaine Kaplan, Gregory O'Duden, Clinton D. Wolcott, Nat. Treasury Employees Union, Washington, D.C., for plaintiff.

Mary Goetten, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

**JOHN H. PRATT, District Judge.**

Plaintiff, the National Treasury Employees Union (NTEU), brings this action challenging the legality of the Department of Energy's (DOE) "Drug–Free Federal Work Place Testing Implementation Program" (DOE Program), which authorizes the random urinalysis drug testing of certain DOE employees the agency has designated as holding "sensitive" positions and "reasonable suspicion" urinalysis testing of all DOE employees. Plaintiff has moved for a preliminary injunction enjoining the implementation of the program on its members pending a decision on the merits. Plaintiff argues that the proposed testing is an unconstitutional infringement of the Fourth Amendment rights of NTEU members. The issues have been extensively briefed and a hearing on the motion was held on June 13, 1989.

## I. Background

NTEU is a federal sector labor union that represents 2,200 DOE Headquarters employees. All DOE employees in NTEU's bargaining unit have been notified that they will be subject to reasonable suspicion urinalysis testing. Additionally, DOE has notified 31 NTEU member employees that they will be subject to random testing. NTEU seeks preliminary relief only as to 24 of its members [1] who are designated for immediate random testing and all of its members who are subject to reasonable suspicion testing.

The DOE Program was instituted pursuant to Executive Order 12,654, 51 Fed.Reg. 32,889 (1986), which requires all executive agency heads to create and implement plans to achieve a drug-free workplace, including plans to institute random, reasonable suspicion and post-accident urinalysis drug testing of employees. On July 29, 1988, DOE issued regulations describing its program to implement the Executive Order. DOE Order 3792.3. On June 13, 1989, DOE issued a detailed "Drug Free Federal Work Place Plan" (DOE Plan), which explains how the regulations would be implemented, along with a general notice to all of its employees that drug testing would begin after 60 days. Due to the pendency of this action, the government has agreed to delay testing until June 19, 1989.

### Random testing

The DOE Order sets out five categories of "sensitive positions" which may be subject to random testing. DOE Order § I(2).[2] A total of 1,150 out of 16,000 DOE employees nationwide, approximately 7% of the DOE workforce, were designated to hold sensitive positions for which random testing is required. Defendant's Memorandum, Exhibit A, Declaration of J. Merle

---

1. NTEU seeks preliminary relief against random testing for 18 of its members who hold the position of Motor Vehicle Operator and 6 of its members who hold the positions of Computer and Communications Specialists or Assistants.

2. The categories include employees with access to sensitive information, presidential appoin-

tees, law enforcement officers, employees whose duties involve law enforcement or the national security, positions determined to involve the protection of life or property, positions involved in public health or safety, and positions which involve a high degree of trust. *Id.*

Schulman ¶ 19. Employees selected for random testing will generally receive notice within 2 hours of the scheduled test. DOE Order § II(5)(a).

As stated previously, NTEU seeks preliminary relief against random testing only as to 24 DOE employees. Of these, 18 hold positions as motor vehicle operators and drive cars or vans to transport documents and passengers throughout the Washington metropolitan area. Three of the motor vehicle operators are required to maintain a Level 2 security clearance (a clearance for access to "top secret" information) and carry firearms to protect the documents they transport. The remaining 15 motor vehicle operators are required to maintain a Level 3 security clearance ("secret" information) and do not carry firearms. The remaining six employees of concern to us here are Computer and Communications Specialists or Assistants. These employees operate secured computerized voice and facsimile communications equipment for DOE, transmitting both sensitive and non-sensitive information through appropriate agency channels. The Communications Specialists have a DOE Q/Secured Compartmentalized Information (SCI) security clearance and are required to submit to a background investigation before working in the secured Communications Center.

### Reasonable Suspicion Testing

The DOE Program also provides for "reasonable suspicion" testing of any employee, regardless of the sensitivity of his or her position and regardless of whether the suspected drug use occurred during work hours. *See* DOE Order § 4(f). Su-

pervisors are to initiate the reasonable suspicion testing based upon, among other things:

> (1) observable phenomena, such as direct observation of drug use or possession and/or the physical symptoms of being under the influence of a drug; (2) a pattern of abnormal conduct or erratic behavior; (3) arrest or conviction for a drug-related offense, or the identification of an employee as the focus of a criminal investigation into illegal drug use, possession or trafficking; (4) information provided either by reliable and credible sources or independently corroborated; or (5) newly discovered evidence that an employee has tampered with a previous drug test.

*Id.*

### Testing Procedures

Consistent with the Executive Order and regulations, the DOE Order describes the procedures the agency will use to collect an employee's urine and mandates discipline for employees who do not cooperate. DOE Order § II(6).[3] Employees who test positive are given an opportunity to present evidence of legitimate drug use to a Medical Review Officer, who may cancel a positive test result. *Id.* § III(2). Employees who are found to have a verified positive test result must be disciplined; first offenders are generally required to either undergo rehabilitation or be dismissed from employment. *Id.* § III(3), (5). An employee who tests positive must also be removed from a sensitive position pending rehabilitation. A second verified positive test results in automatic dismissal. *Id.*

---

**3.** An employee selected for random testing is, upon notice, directed to report to a designated private site or restroom. Upon arrival at the collection site, an employee is required to provide identification and surrender unnecessary outer garments and personal possessions, which could conceal substances that could be used to adulterate the urine specimen. The employee is generally permitted to provide the specimen in the privacy of a stall or behind a partition, while a "collection site person" or monitor of the same sex as the employee remains on the site. The monitor is to note any unusual behavior of the employee while the sample is being collected in a permanent record book. If the amount of urine collected is not sufficient (at least 60

milliliters), the employee may be detained and required to drink additional liquids until an adequate specimen is provided. If the monitor believes that the employee may have tampered with the specimen or if the sample is outside a certain temperature range or if the employee's supervisor believes that the specimen will be altered, the collection site person must directly observe the employee produce the urine specimen. DOE Order II(6)(a). Employees targeted for reasonable suspicion testing also must produce urine specimens under direct observation. DOE Order § X(D). An employee who fails to produce an adequate sample is subject to disciplinary action, "up to and including removal." DOE Notice (Plaintiff's Exhibit 7 at ¶ 7).

## II. Discussion

■ The traditional standards governing the issuance of a preliminary injunction require us to consider: (1) the likelihood that plaintiff will succeed on the merits; (2) the threat of irreparable harm to the plaintiff if the injunction is not granted; (3) the possibility that the defendant and others will suffer substantial harm in the event that injunctive relief is granted; and (4) the interest of the public. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841 (D.C.Cir.1977); *see also Population Institute v. McPherson,* 797 F.2d 1062, 1078 (D.C.Cir.1986).

An extended review of these issues is not required in view of the fact that several other members of this court, Judges Oberdorfer,[4] Greene,[5] Flannery,[6] Revercomb,[7] Hogan,[8] and Gesell,[9] have been presented with the same problem. In the majority of these cases, the court has enjoined the random testing provisions of the drug-testing plans at issue. *Hartness v. Bush,* 712 F.Supp. 986 (D.D.C.1989)[10]; *Bangert v. Hodel,* 705 F.Supp. 643 (D.D.C.1989); *National Treasury Employees Union v. Lyng,* 706 F.Supp. 934 (D.D.C.1988); *Harmon v. Meese,* 690 F.Supp. 65 (D.D.C.1988), *appeal pending,* No. 88–427 (D.C.Cir.); *National Federation of Federal Employees v. Carlucci,* 680 F.Supp. 416 (D.D.C. 1988), *appeal pending,* No. 88–5080 (D.C. Cir.). In each case in which the issue was raised (*Hartness, Lyng* and *Bangert*), the court narrowed the reasonable suspicion testing programs.

The Supreme Court has recently issued two decisions that offer us some guidance. *Skinner v. Railway Labor Executives' Association,* — U.S. —, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding post-accident testing of railroad employees); *National Treasury Employees Union v. Von Raab,* — U.S. —, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (upholding one-time testing during medical examination of employees who apply for promotion to positions of the Customs Service that directly involve drug interdiction or require firearms). Neither deals directly with the issue of random drug testing. However, both tend to confirm the analysis employed by the district courts in this Circuit in earlier cases, focusing on the nature of the governmental interests to be protected as balanced against the nature of the privacy interests at stake. Specifically, the cases direct us to consider the extent of the privacy invasion, including the circumstances which enhance or reduce the employees' legitimate expectation of privacy, and any "special governmental needs" which may make the testing necessary. *Von Raab,* 109 S.Ct. at 1390.

In the present case, the government, in support of random testing, cites its interest in safety considerations attendant to the operators of motor vehicles or employees who carry firearms and its interest in the integrity of employees who have access to sensitive or classified information.

We believe that the safety risks involved with the motor vehicle operators carrying-out their duties are no greater than the normal risks associated with vehicle use by the general public. *See NTEU v. Lyng,* 706 F.Supp. at 947. The fact that three of the motor vehicle operators are required to

---

**4.** *Hartness v. Bush,* 712 F.Supp. 986 (D.D.C. 1989) (Executive Office of the President and General Services Administration).

**5.** *Bangert v. Hodel,* 705 F.Supp. 643 (D.D.C.1989) (Department of Interior).

**6.** *Uniformed Division of Officers Ass'n v. Brady,* No. 88–3377, slip op., 1988 WL 142378 (D.D.C. Dec. 23, 1988) (Secret Service); *National Treasury Employees Union v. Lyng,* 706 F.Supp. 934 (D.D.C.1988) (Department of Agriculture).

**7.** *Harmon v. Meese,* 690 F.Supp. 65 (D.D.C. 1988), *appeal pending,* No. 88–472 (D.C.Cir.) (Department of Justice).

**8.** *National Federation of Federal Employees v. Carlucci,* 680 F.Supp. 416 (D.D.C.1988), *appeal pending,* No. 88–5080 (D.C.Cir.) (Department of Army).

**9.** *AFGE v. Dole,* 670 F.Supp. 445 (D.D.C.1987), *appeal pending,* No. 87–5417 (D.C.Cir.) (Department of Transportation).

**10.** Judge Oberdorfer did not grant preliminary relief to Government Services Administration employees who carry firearms. *Hartness,* 712 F.Supp. at 993.

carry firearms is not dispositive. Numerous courts have rejected random or compulsory testing of employees who carry firearms as part of their appointed duties. *See Bangert,* 705 F.Supp. 643, 648 & n. 17. *But see Hartness,* 712 F.Supp. at 992–93. These drivers, unlike the employees in *Von Raab,* are not law enforcement officers with on-going contact with the public, engaged in the dangerous task of tracking criminals. Rather, they are engaged in the task of document transportation. The likelihood of the drivers ever needing to use their guns appears, on the record before us, extremely remote.

DOE also argues that the motor vehicle operators and computer and communication specialists and assistants have a diminished expectation of privacy by virtue of possessing security clearances. This claim, which requires speculation on our part, is not persuasive. We believe the fact that the employees at issue here hold security clearances tends more to reflect an expectation of decreased privacy in the *screening process* that such an investigation entails than an expectation resulting from an ongoing, surprise surveillance that the proposed random testing would entail. *See Von Raab,* 109 S.Ct. at 1397 (likening urine testing to the screening involved in background investigations and medical investigations). Although the employees at issue have administrative contact with sensitive documents—either transporting them in the case of the drivers, or transmitting them in the case of the computer and communications specialists and assistants—the employees, thus far, have never been subjected to ongoing security checks or strict job controls once their security clearance has been determined. They are not required to routinely disclose information concerning their medical or financial circumstances and are not required to undergo routine physical examinations for work.

Moreover, the government's interest in randomly testing these employees is sharply undercut by the complete absence of any history of drug-related accidents, safety violations or a single incident of blackmail or bribery involving employees in these positions.[11] Although the lack of evidence pointing to widespread drug use is not conclusive and, of course, not itself fatal to a drug-testing program, especially where extraordinary safety and national security hazards are present, *Von Raab,* 109 S.Ct. at 1395, it nevertheless appears to be a factor to consider when reviewing "all the circumstances surrounding the search." *Skinner,* 109 S.Ct. at 1414, *quoting United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985); *see also Hartness,* 712 F.Supp. at 991 (noting that "while *Skinner* and *Von Raab* abandoned any requirement for particularized, individualized suspicion as a predicate for random testing, the fact bound opinions require substantial *generalized* suspicion").

Defendant has not demonstrated that these employees pose the imminent risk of "disastrous consequences" that supported the government's interest in *Skinner* and *Von Raab.* *Cf. Skinner,* 109 S.Ct. at 1407–8; *Von Raab,* 109 S.Ct. at 1392.

The government would be on surer footing in the factual setting of a one-time post-accident testing or a one-time scheduled testing as a prerequisite for promotion, as were at issue in *Skinner* and *Von Raab.* The situation is quite different here. The proposed random testing requires employees to expose themselves to an invasion of personal privacy on a recurring and surprise basis during the ordinary workday. This is more than even a non-

11. The government presents evidence of one DOE computer and communications assistant entering a rehabilitation program after admitting to being on duty under the influence of cocaine and a second employee being discharged for distributing drugs (to the first employee). These incidents occurred in 1984. Additionally, DOE operations offices reported six cases (1 each in 1986–1988 and 3 in 1989) in which sensitive employees were identified as drug users in connection with background investigations (5 cases) or were arrested (1 case). Finally, DOE's Federal Employee Assistance Program Report for Fiscal Year 1988 identified 30 employees, presumably out of 16,000 DOE employees, who were counseled for use of drugs other than alcohol. Defendant's Exhibit A, Declaration of J. Merle Schulman at ¶¶ 20–21.

sensitive person should be required to undergo.

While the issue is not completely free from doubt, the court finds that there is a substantial likelihood that plaintiff will prevail on the merits of its challenge to the constitutionality of DOE's proposed random urinalysis testing. Defendant has failed to justify the reasonableness of the search at issue. Without the requested relief, these employees must either submit to an unconstitutional search or risk dismissal. DOE will not suffer any substantial harm from a preliminary injunction barring the random urine testing of these employees. We find that the public interest also will be well served by maintaining the status quo, particularly in view of the random testing cases pending before the D.C. Circuit.

 With regard to reasonable suspicion testing, the issue is clearer. Other judges in this Circuit who have addressed the issue have permitted such testing to go forward provided that there is a reasonable, articulable and individualized suspicion that a specific employee may be under the influence of drugs while on duty.[12] We too agree and shall uphold reasonable suspicion testing provided that DOE adheres to the additional safeguard that such testing shall be based on reasonable, articulable and individualized suspicion that a specific employee may be under the influence of drugs while on duty.

An order consistent with the forgoing has been entered this day.

## ORDER

Upon consideration of plaintiff's motion for a preliminary injunction, defendant's opposition thereto, and the entire record herein, and for the reasons set forth in the accompanying memorandum opinion, it is by the Court this 16th day of June, 1989 ORDERED that plaintiff's motion for a preliminary injunction is granted in part and denied in part; and it is

ORDERED that, pending a decision on the merits, defendant is enjoined from conducting proposed random urinalysis testing of plaintiff's members who hold positions as motor vehicle operators or computer and communications specialists or assistants; and it is

FURTHER ORDERED that plaintiff's motion for a preliminary injunction enjoining defendant from conducting proposed "reasonable suspicion" drug testing is denied, provided that such testing of NTEU members represented in this case is based upon reasonable, articulable and individualized suspicion that a specific employee may be under the influence of drugs while on duty.

---

12. *See Hartness,* 712 F.Supp. at 992 (enjoining reasonable suspicion testing "at least until the GSA plan is revised to provide that such testing is based upon reasonable, articulable, and individualized suspicion of use of drugs on or off duty, causing a reasonable suspicion that a specific employee may be under the influence of drugs while on duty); *Bangert,* 705 F.Supp. at 650–51 (upholding reasonable suspicion testing provided agency conformed to safeguards cited therein); *Lyng,* 706 F.Supp. at 950 (same).