**Norman HARTNESS, et al.**

v.

**George BUSH, President of the United States, et al., Appellants.**

**No. 90–5050.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 7, 1990.

Decided Nov. 16, 1990.

Lowell V. Sturgill, Jr., Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Patricia M. Bryan, Deputy Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, were on the brief, for appellants.

Jeffrey F. Liss, with whom Arthur B. Spitzer and Elizabeth Symonds, American Civil Liberties Union, Washington, D.C., were on the brief, for appellees.

Before MIKVA, EDWARDS, and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring Opinion filed by Circuit Judge MIKVA.

Dissenting Opinion filed by Circuit Judge HARRY T. EDWARDS.

SILBERMAN, Circuit Judge:

This appeal challenges a preliminary injunction that, as modified by the district court, forbids a number of agencies in the Executive Office of the President ("EOP") from conducting random urinalysis drug-testing of employees with "secret" national security clearances. 712 F.Supp. 986. We hold that the prior decisions of the Supreme Court and of this court establish the validity of random drug testing of such personnel and, therefore, reverse the district court's decision.

I.

In 1986, President Reagan promulgated Executive Order No. 12,564, the goal of which was to create a "drug-free Federal workplace." 51 Fed.Reg. 32,889 (Sept. 17, 1986). Pursuant to the order, in July 1988 the EOP issued its own Drug–Free Workplace Plan covering its constituent agencies. Each agency designates employees whose position requires random urinalysis testing. The actual procedures for choosing the individuals to be tested, obtaining urine specimens, and testing the specimens for drugs are substantially identical to the procedures this court upheld with respect to personnel holding "Top Secret" security clearances in *Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990). These procedures "significantly minimize" intrusion on the employees' privacy expectations. *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 1394 n. 2, 103 L.Ed.2d 685 (1989).

On May 19, 1989, the district court entered a preliminary injunction barring the government from random drug testing of plaintiffs in the top secret and secret categories.[1] After our decision in *Harmon*,

1. Pursuant to the Executive Order 12356, there are three levels of national security classification: top secret, secret and confidential. "Top Secret" information is information "the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security." *Id.* § 1.1(a)(1). "Secret" information is information "the unauthorized disclosure of which reasonably could be expected to cause serious damage to the

the district court modified the injunction by excluding from its scope the personnel holding top secret clearances. The government now appeals the temporary injunction forbidding the testing of the personnel holding secret clearances.

## II.

We are guided of course by those decisions of the Supreme Court and of this court that bear on the question. The framework of the analysis of challenges to drug testing is provided by *Von Raab* and *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). *Von Raab* and *Skinner* establish the following propositions: urinalysis testing is a significant intrusion into the privacy interests of employees and as such is a search within the Fourth Amendment, *see Von Raab,* 109 S.Ct. at 1390; *Skinner,* 109 S.Ct. at 1412–13, and it does not require a warrant, a probable cause, or any level of individualized suspicion, *see Von Raab,* 109 S.Ct. at 1390; *Skinner,* 109 S.Ct. at 1416–17, but is instead governed by the balancing process weighing the interests of the government *qua* employer against the privacy interests of the employees, *see Von Raab,* 109 S.Ct. at 1390; *Skinner,* 109 S.Ct. at 1413–14. Those governmental interests powerful enough to justify urinalysis testing include the public security interests that can be endangered by employees with access to national security information, *see Von Raab,* 109 S.Ct. at 1396–97, by personnel who carry firearms in the course of their employment, *see National Fed'n of Federal Employees v. Cheney,* 884 F.2d 603, 612–13 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990); by personnel with access to drugs or who prosecute drug cases, *see Harmon,* 878 F.2d at 490; and by employees who control or have access to dangerous instrumentalities, *see Cheney,* 884 F.2d at 610–11; *American Fed'n of Gov't Employees v. Skinner,* 885 F.2d 884, 891–92 (D.C.Cir.

1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1960, 109 L.Ed.2d 321 (1990). All of these propositions are now part of settled Fourth Amendment law.

*Von Raab* further recognized that the government has a compelling interest in the discovery of drug use to protect "truly sensitive information." But the Court in that case used both the terms "sensitive" and "classified" in such a fashion as to suggest that it was unsure of the strength of the government's interest in protecting the information to which some of the employees involved—such as "animal caretaker[s]," "baggage clerk[s]," and "co-op student[s]"—had access. *Von Raab,* 109 S.Ct. at 1396–97. Indeed, it was not clear that those employees had security clearances of any kind.

Subsequently, in *Harmon* we were faced with the question of the strength of the government's interest in the protection of top secret information. The court (unanimous on this point) was unequivocal in its assessment of this interest: "[w]hatever 'truly sensitive' information includes, we agree that it encompasses top secret national security information." 878 F.2d at 491 (footnote omitted). We therefore held that a person with a top secret clearance generates sufficiently grave potential risk to national security to make the decision to conduct random urinalysis testing reasonable *regardless of any other attendant circumstances.* Appellees argue that *Harmon* short-circuited the *Von Raab/Skinner* balancing test by disregarding the employees' privacy interest and by not examining the degree of supervision to which the employees were subject. Just so—in any balancing test, certain factors may be decisive whenever they are present. Implicitly, but necessarily, *Harmon* assumed that the degree of supervision of a holder of top secret clearance was irrelevant and that he or she had diminished privacy expectations. The government's primary concern with regard to material classified as top secret (or secret) is that an employee could be induced, perhaps by a

---

national security." *Id.* § 1.1(a)(2). "Confidential" information is information "the unauthorized disclosure of which reasonably could be

expected to cause damage to the national security." *Id.* § 1.1(a)(3).

blackmailer who is aware of employee's illegal drug use, to disclose the information. *See Department of Navy v. Egan,* 484 U.S. 518, 528, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1988). If an employee using illegal drugs has access to the information because of his clearance, the degree of his supervision presumably would not reduce the risk of disclosure. As for the privacy interest, a number of cases, besides *Harmon,* have recognized that holders of security clearances have less of an expectation of privacy. *See Von Raab,* 109 S.Ct. at 1397 (background investigations "may be expected to diminish [the employees'] expectations of privacy in respect of a urinalysis test"); *Thomson v. Marsh,* 884 F.2d 113, 115 (4th Cir.1989).

*Harmon*'s insight that, at its peripheries, a balancing test may be presumed always to yield one result is hardly novel. The Supreme Court has preserved the overall balancing test of "reasonableness" required by the Fourth Amendment while articulating several *per se* rules of specialized application which automatically allow searches of pre-determined scope under specified circumstances. *See, e.g., United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (all containers within an automobile are subject to a search if there is cause to search the automobile itself); *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (the entire inside area of the automobile can be presumed to be within the reach of the arrestee and is subject to a search incidental to a lawful arrest); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search incident to a lawful arrest may extend to any area " 'within [arrestee's] immediate control,' " *id.* at 763, 89 S.Ct. at 2040). Indeed, a number of drug-testing cases in this court are premised on the assumption that the commands of *Von Raab* can be fulfilled by drawing clear demarcation lines. We consistently assumed that some jobs performed by the federal employees create sufficiently grave risks as to make random drug testing reasonable in all circumstances. Thus, we did not

place great weight on the precise type of weapons carried by the guards when we approved random urinalysis testing of them, *Cheney,* 884 F.2d at 612–13, and we did not base our decision that bus drivers can be tested on the precise number of people they transport, *AFGE,* 885 F.2d at 893.

Appellees argue, nevertheless, that the change of the threat from "exceptionally grave damage to national security" (top secret) to "serious damage to national security" (secret) is of constitutional magnitude and that we are, therefore, required to apply a different analysis than we did in *Harmon*—particularly because appellees imply that *Harmon* was itself a dubious interpretation of *Von Raab* and should not, therefore, be extended. We do not see, however, how the constitutional permissibility of drug testing can depend on whether the employees tested have access to information the disclosure of which causes "only" *serious* damage as opposed to *exceptionally grave* damage to national security. Nothing in Fourth Amendment jurisprudence suggests that a distinction of constitutional principle can be drawn between the two categories. That is why the dissent's effort to draw a constitutional "line in the sand" between top secret and secret (interpreting the word "reasonable" in the Fourth Amendment) seems so labored.[2]

And none of the claimed distinctions raised by appellees between this case and *Harmon* are determinative. The privacy interests of employees holding top secret and secret clearances are not significantly different: in both cases the employees know that their conduct on- and off-work is of significant concern to the federal government and that at periodic intervals the government will conduct further inquiries into their behavior and associations. *See, e.g.,* 32 C.F.R. Part 154.19 (1989). The frequency of exposure to secret documents (or lack of it) is not crucial; in *Harmon,* this court held that for employees with top secret clearances, random urinalysis tests

---

**2.** Even if we thought *Harmon* was in error in presuming the results of the balancing test, we

are not free to reexamine its holding other than *en banc.*

are permissible regardless of the fact that some employees may be rarely, if ever, exposed to such materials. "The whole point of granting top secret security clearances in advance is to provide flexibility, to ensure that employees can be given access to top secret materials as soon as the need arises." *Harmon*, 878 F.2d at 492. Similarly, the closeness of supervision is non-dispositive in this context. *Harmon* rejected the argument that employees in a "traditional office environment" (one of the factors mentioned in *Von Raab*, 109 S.Ct. at 1397, as lessening the need for testing) are necessarily immune under the Fourth Amendment from random testing. *Harmon*, 878 F.2d at 492. We cannot imagine, for instance, the permissibility of testing a holder of a secret clearance turning on whether he normally worked next door to a supervisor or on the floor below.

\*    \*    \*    \*    \*    \*

The order of the district court is reversed.

MIKVA, Circuit Judge, concurring:

I agree with Judge Silberman that the district court's order must be reversed insofar as it enjoins random urinalysis drug-testing of employees in the Executive Office of the President who hold "secret" national security clearances. Using *Harmon v. Thornburgh* as a starting point, the difference between the government's interest in testing *secret* clearance-holders and its interest in testing *top secret* clearance-holders is not significant enough to tip the constitutional scales against testing. I do not think it necessary, however, to go beyond this narrow holding.

HARRY T. EDWARDS, Circuit Judge, dissenting:

At issue in this case is the degree to which the Government must justify its decision to subject holders of secret security clearances to random urinalysis testing.

The Government contends that relevant case law establishes a *per se* rule permitting the testing of secret clearance holders, relieving it of the obligation to justify such testing on a case-by-case basis. The District Court disagreed, enjoining testing of secret clearance holders pending trial, at which the Government would be required to justify its testing program as reasonable in light of attendant circumstances. In my view, the District Court correctly concluded that governing law does not allow random testing of employees with secret security clearances solely because of those clearances and regardless of surrounding circumstances. Therefore, I would affirm the District Court order.

I write separately not only because I disagree with the decision to reverse the District Court order, but also to express my growing concern about the degree to which individual rights and liberties appear to be falling victim to the Government's "War on Drugs." No one can seriously doubt that the goal of thwarting illegal drug use and trafficking is critically important. The question raised by this case and other cases like it, however, is not whether the Government's end is worthy, but whether the end can justify means that run contrary to first constitutional principles. In my view, the judiciary is bound to answer in the negative.

The Fourth Amendment is not some discretionary doctrine, subject to waiver for good cause. It is instead a constitutional command, and as such stands apart from and above contemporary expediencies. Faced regularly with the grim results of the illegal drug trade, the judiciary may well be tempted to offer aid to the Government in its War on Drugs. But no matter how pressing the perceived need, the judiciary is simply without authority to trim back the Fourth Amendment. There is, and can be, no "drug exception" to the Fourth Amendment.[1]

---

1. See *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 1426, 103 L.Ed.2d 639 (1989) (Marshall, J., dissenting); Saltzburg, *Another Victim of Illegal Narcotics: The Fourth Amendment (As Illustrated by the Open Fields Doctrine)*, 48 U.PITT.L.REV 1 (1986); Wisotsky, *Crackdown: The Emerging "Drug Exception" to the Bill of Rights*, 38 HASTINGS L.J. 889 (1987); see also Thompson, *Fourth Amendment Is Trampled in Drug Offensive, Critics Say; More Courts*

I fear that with today's decision, we move closer to reshaping basic Fourth Amendment doctrine to accommodate the exigencies of the moment. The War on Drugs is not the first battle in which zealous warriors, frustrated by the limits of the law, have called for the abridgement or abolition of fundamental civil liberties. We have seen other wars and other constitutional casualties. *See, e.g., Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (sustaining a military order incarcerating and dispossessing all Americans of Japanese origin on the West Coast following Pearl Harbor during World War II).[2] And when the war is over, we find that departures from constitutional norms, legitimized by the courts, have lasting and wide-ranging effects. Constitutional principles, once abandoned, are not easily reclaimed.

We are asked today to announce a *per se* rule, permitting random drug testing of secret clearance holders in the absence of any factual showing by the Government that such testing will address a real problem or advance some significant national security interest. Justice Scalia's dissent in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 1399–1401, 103 L.Ed.2d 685 (1989) (Scalia, J., dissenting), in which the Court upheld suspicionless drug-testing of employees in the Customs Service applying for promotion to positions involving interdiction of illegal drugs, is on point here:

> The Court's opinion in the present case ... will be searched in vain for real evidence of a real problem that will be solved by urine testing of Customs Service employees....
>
> The Court's response to this lack of evidence is that "[t]here is little reason to believe that American workplaces are immune from [the] pervasive social prob-

*Upholding Random Searches,* Wash. Post, May 7, 1990, at 1, col. 1.

**2.** *Korematsu* "represents the nefarious impact that war and racism can have on institutional integrity and cultural health." L. Tribe, American Constitutional Law 1000 (1978).

*See also Dennis v. United States,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (Cold War conviction for teaching of communist doctrine).

lem" of drug abuse.... But if such a generalization suffices to justify demeaning bodily searches, without particularized suspicion, to guard against the bribing or blackmailing of a law enforcement agent, or the careless use of a firearm, then the Fourth Amendment has become frail protection indeed....

....

... I do not believe for a minute that the driving force behind these drug-testing rules was any of the feeble justifications put forward by counsel here and accepted by the Court. The only plausible explanation, in my view, is what the Commissioner himself offered in the concluding sentence of his memorandum to Customs Service employees announcing the program: "Implementation of the drug screening program would set an important example in our country's struggle with this most serious threat to our national health and security." ... I think it obvious that this justification is unacceptable; that the impairment of individual liberties cannot be the means of making a point; that symbolism, even symbolism for so worthy a cause as the abolition of unlawful drugs, cannot validate an otherwise unreasonable search.

I have no doubt that our approval of the Executive Office's urine testing program will allow the Government to claim a symbolic victory in the War on Drugs. But victory purchased at the expense of individual rights is illusory; in the end, we will almost surely regret the price we pay. And even if we are now prepared, as a matter of policy, to trade rights for results, the Fourth Amendment prohibits us, as a matter of law, from making such a short-sighted sacrifice.

The Court in *Dennis* distinguished between protected discussion and unprotected advocacy of revolutionary violence. *Dennis* was subsequently "reinterpreted" in *Yates v. United States,* 354 U.S. 298, 318–24, 77 S.Ct. 1064, 1076–79, 1 L.Ed.2d 1356 (1957), in which the Court distinguished between protected advocacy of doctrine and unprotected advocacy of action.

With these concerns in mind, I dissent from today's decision.

## I. BACKGROUND

The Executive Office of the President ("EOP") adopted a Drug–Free Workplace Plan in July 1988. The EOP drug testing program applies to the immediate White House Office and the Office of the Vice President, and to separate component agencies bearing a relationship to the work of the President. This case arises out of a suit filed by 30 employees of three government agencies: the Office of Management and Budget ("OMB"), the Office of Administration ("OA") and the United States Trade Representative ("USTR").

As part of a comprehensive urinalysis drug testing program, the EOP plan calls for random testing of employees holding specially designated, sensitive positions.[3] Among the criteria to be considered by agency heads in designating positions for random testing are whether a position requires a security clearance as a condition of employment and whether a position involves access to sensitive information. J.A. 102. It appears from the record that every position at OA and USTR and over one third of the positions at OMB are subject to testing under the EOP program. *See* J.A. 229, 215–16, 208–12; *see also* Brief for Appellees at 4–5.

All 30 of the employees involved in this suit ("appellees") work in testing-designated positions. Nineteen hold "top secret" security clearances, 10 hold "secret" clearances, and one holds no security clearance. J.A. 316. The degree to which the appellees' positions involve actual access to sensitive material is not yet clear on the record, though a number of appellees aver that they never or only rarely view classified documents. *See* J.A. 226–28, 292–93. All of the appellees generally work in supervised, traditional office environments. J.A. 259.

In May 1989, the District Court entered a preliminary injunction barring the three

EOP agencies in question from conducting random drug testing of the appellees. *Hartness v. Bush,* 712 F.Supp. 986 (D.D.C. 1989). The District Court judge concluded that, on the underdeveloped record before him, the Government was unlikely to show an interest sufficiently compelling to justify random testing, or to show that the criteria it used to select positions for testing was sufficiently precise. *Id.* at 993.

In January 1990, after intervening decisions by this court, the District Court vacated the preliminary injunction with respect to appellees holding top secret security clearances. *Hartness v. Bush,* 751 F.Supp. 1 (D.D.C.1990), *reprinted in* J.A. 316. The trial judge found that, under *Harmon v. Thornburgh,* 878 F.2d 484 (D.C.Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990), employees with top secret clearances may be subjected to random drug testing as a matter of law. The District Court refused, however, to vacate the injunction with respect to secret clearance holders, concluding that "[i]t is not at all clear in the present state of the controlling decisions that the government may test the urine of all employees solely because they possess secret security clearances irrespective of the circumstances...." J.A. 318–19. To facilitate consideration of the relevant circumstances, the District Court deferred decision on the parties' cross-motions for summary judgment and ordered discovery on the procedures and criteria used to select positions for testing. *See* J.A. 319–20.

On appeal, the Government challenges the District Court order insofar as it continues to enjoin the random testing of employees with secret clearances.

## II. ANALYSIS

### A.

Our consideration of the EOP drug testing program is framed by certain well-set-

---

**3.** The EOP plan also authorizes applicant testing, testing on reasonable suspicion of drug use, voluntary testing, post-accident testing and testing as follow-up to rehabilitation or counseling. Joint Appendix ("J.A.") 82. All testing procedures are governed by Department of Health and Human Services Mandatory Guidelines for Federal Workplace Drug Testing Programs, 53 Fed.Reg. 11,970 (1988). *See* J.A. 110.

tled propositions of Fourth Amendment law. The Fourth Amendment protects against "unreasonable searches and seizures" by all government authorities. *See New Jersey v. T.L.O.,* 469 U.S. 325, 335, 105 S.Ct. 733, 739, 83 L.Ed.2d 720 (1985). In normal circumstances, a search is "reasonable" under the Fourth Amendment only if supported by a warrant issued on probable cause. *See, e.g., Katz v. United States,* 389 U.S. 347, 356–57, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Even in those limited and exceptional circumstances in which the warrant requirement is relaxed, probable cause generally remains the touchstone for determining the constitutionality of a full-scale search. *See, e.g., Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *see also T.L.O.,* 469 U.S. at 340, 105 S.Ct. at 742.

Excepted from this core probable cause requirement are minimally intrusive government actions that do not rise to the level of full-scale searches. Such actions may be valid where based on a level of individualized suspicion that falls short of probable cause. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 24–27, 88 S.Ct. 1868, 1881–83, 20 L.Ed.2d 889 (1968) (upholding limited "stop-and-frisk" based on reasonable suspicion). However, excluding a narrow class of cases where routinized, nonintrusive encounters entail no contact with the person, some quantum of individualized suspicion is necessary to justify a search as "reasonable." *See United States v. Martinez-Fuerte,* 428 U.S. 543, 557–61, 96 S.Ct. 3074, 3082–84, 49 L.Ed.2d 1116 (1976) (individualized suspicion ordinarily required, but not where routine border checkpoints entail searches of neither vehicles nor their occupants).

This basic framework has been modified in recent years with the introduction of a "special needs" exception to the warrant and probable cause requirement. When "special needs" beyond the normal need for law enforcement make the warrant and probable cause standard "impracticable," the Government may now conduct full-scale searches under a less demanding "reasonable under all the circumstances" standard. *See Griffin v. Wisconsin,* 483 U.S. 868, 873–74, 107 S.Ct. 3164, 3168–69, 97 L.Ed.2d 709 (1987) (search of probationer's home by probation officer); *O'Connor v. Ortega,* 480 U.S. 709, 725–26, 107 S.Ct. 1492, 1501–02, 94 L.Ed.2d 714 (1987) (work-related search of employee's desk by government employer); *T.L.O.,* 469 U.S. at 341, 105 S.Ct. at 742 (search of student's purse by school official). Without actually deciding whether individualized suspicion is a necessary precondition of "reasonableness under all the circumstances," the Supreme Court until 1989 sustained as "reasonable" under the special needs doctrine only searches that were in fact supported by individualized suspicion. *See Griffin,* 483 U.S. at 875, 107 S.Ct. at 3169; *Ortega,* 480 U.S. at 726, 107 S.Ct. at 1502; *T.L.O.,* 469 U.S. at 342 n. 8, 105 S.Ct. at 743 n. 8.

The Supreme Court moved a step further from traditional Fourth Amendment standards when it upheld the constitutionality of government drug testing programs in *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). The Court determined, first, that although government-compelled urinalysis tests constitute "searches," *Skinner,* 109 S.Ct. at 1413, they are excepted from the Fourth Amendment's warrant and probable cause requirement because they serve "special needs" beyond law enforcement, *id.* at 1414. Moreover, the Court concluded that such searches may be reasonable even in the absence of any individualized suspicion, *id.* at 1417, *Von Raab,* 109 S.Ct. at 1392, marking its first departure under the special needs doctrine from the fundamental Fourth Amendment mandate that government searches be based on some form of particularized suspicion. Under the balancing test applied in *Skinner* and *Von Raab,* a drug test in the employment context is "reasonable" and therefore constitutional if, in light of all surrounding circumstances, the governmental interest it serves outweighs the intrusion on individual privacy interests it occasions. *Skinner,* 109 S.Ct. at 1414; *Von Raab,* 109 S.Ct. at 1392.

The question before us today is whether the EOP drug testing program will be held to this latest and most minimal Fourth Amendment "reasonableness" standard. The Government asks that we move one critical step further from the Fourth Amendment, excepting random testing of secret clearance holders from the *Skinner* and *Von Raab* balancing test as *per se* reasonable. I agree with the District Court that governing law does not permit us to take this final step.

### B.

The Government argues, in essence, that its interest in protecting sensitive information is sufficiently weighty that it will justify random testing of employees with secret security clearances in all cases, regardless of surrounding circumstances. Or, as explained by Judge Silberman, the Fourth Amendment balancing test "may be presumed always to yield one result" when applied to testing of secret clearance holders. The magnitude of the governmental interest at stake renders irrelevant such contextual factors as the degree to which employees have actual access to sensitive materials and the amount of supervision to which they are subject on the job, and establishes the *per se* "reasonableness" of urinalysis testing.[4]

In support of this position, the Government relies primarily on *Harmon v. Thornburgh*, 878 F.2d 484, 491–93 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990), in which this court upheld the drug testing of employees with *top secret* security clearances, regardless

of whether the employees had regular access to secret materials and despite the fact that they worked in closely supervised, traditional office environments. The District Court in this case agreed with the Government that, under *Harmon,* EOP top secret clearance holders may be subject to random drug testing, and the appellees do not dispute this conclusion. Instead, the appellees challenge the extension of *Harmon* to EOP employees with *secret* security clearances, arguing that testing of such employees remains subject to the context-specific balancing test of *Von Raab* and *Skinner.*

Resolution of this issue begins with the Supreme Court's discussion in *Von Raab* of drug testing as a means of advancing the governmental interest in protecting sensitive information. Subsequent decisions by this court, applying and elaborating upon *Von Raab,* guide our analysis as well. Because those decisions must be read in context and accord with *Von Raab,* however, *Von Raab* is the proper starting point for consideration of this case.

In relevant part, *Von Raab* involved a United States Customs Service drug screening program mandating urinalysis testing of applicants for positions requiring the handling of classified material. The Court "readily agree[d] that the Government has a compelling interest in protecting truly sensitive information." 109 S.Ct. at 1396 (citing *Department of the Navy v. Egan,* 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (denial of clearance to nuclear submarine facility employee)).[5] At

---

**4.** Under the EOP plan, testing procedures must accord with government-wide guidelines issued by the Department of Health and Human Services. I do not understand the Government, or either of my colleagues, to argue that drug testing of secret clearance holders would necessarily remain reasonable under the Fourth Amendment were the Government to adopt more intrusive testing procedures. The *per se* rule argued for and adopted today presumes the continued application of testing procedures designed to minimize the privacy intrusion occasioned by such testing.

**5.** Specifically, *Egan* upheld the denial of a security clearance that would have allowed access to information classified secret and confidential

at a nuclear submarine facility. 484 U.S. at 521 & n. 1, 108 S.Ct. at 820 & n. 1. The Government reads *Von Raab*'s citation to *Egan* as evidence that the compelling governmental interest in protecting "truly sensitive" information extends beyond top secret information to secret and confidential information, as well. My reading of the cases is different. *Von Raab*'s citation to *Egan* refers not to the particular security clearance at issue in that case, but to the extremely sensitive nature of the information accessible at a nuclear submarine facility. Like the trial court in this case, *see* 712 F.Supp. at 991–92, and the circuit court in *Harmon, see* 878 F.2d at 492, I read the *Egan* citation as evidence of the very high order of sensitivity contemplated by the *Von Raab* Court.

the same time, however, the Court was unable to uphold the reasonableness of the Customs Service program on the record before it, which did not make evident that all tested positions involved likely access to sensitive information. Instead, the Court remanded to the court of appeals for fact-specific application of the Fourth Amendment balancing test, instructing the court to examine

> the criteria used by the Service in determining what materials are classified and in deciding whom to test under this rubric. In assessing the reasonableness of requiring tests of these employees, the court should also consider pertinent information bearing upon the employees' privacy expectations, as well as the supervision to which these employees are already subject.

*Id.* 109 S.Ct. at 1397.

*Von Raab*'s case-by-case, highly contextual approach to weighing the national security interests advanced by particular drug testing programs is the antithesis of the bright-line rule urged by the Government today. *Von Raab* does not recognize a compelling governmental interest in protecting material at all levels of classification, but only in protecting material that is "truly sensitive." Central to a testing program's reasonableness under *Von Raab* are both the probability that tested employees will gain actual access to sensitive material and the degree to which they are already supervised on the job—precisely the factors that the Government claims are irrelevant to evaluation of the EOP testing program in question today. Essentially, *Von Raab* rejects a *per se* rule allowing testing of employees who may gain access to classified material, and instead demands that the Government justify such testing in each case as reasonable in light of all attendant circumstances under the Fourth Amendment balancing test.

*Harmon v. Thornburgh* excuses the Government from making this case-specific showing with respect to employees holding top secret clearances. Because "top secret national security materials lie at [the] very core" of the "truly sensitive" information in which the Government has a compelling interest, the court determined, Department of Justice attorneys holding top secret clearances may be tested whether or not they have regular access to top secret information and despite the fact that they work in supervised office environments where, presumably, drug use is detectable by less intrusive means. 878 F.2d at 491–92. On the basis of *Harmon*, the District Court concluded, and the appellees do not dispute, that testing of EOP top secret clearance holders may proceed without a predicate inquiry into all surrounding circumstances.

I have serious doubts whether *Harmon*'s categorical approach can be reconciled with *Von Raab*'s insistence on a fact-specific weighing of interests. In my view, *Von Raab* simply does not permit us to eviscerate the Fourth Amendment balancing test by "presuming" its outcome in advance. But even if the *Harmon* exception to *Von Raab* is defensible, it certainly is not so constitutionally secure that we should expand it beyond its intended scope to reach the testing of secret clearance holders.

By its own terms, *Harmon*'s *per se* rule is limited to top secret clearance holders. Indeed, the court in *Harmon* explicitly declined to extend its rule to all employees with access to confidential information, observing that the Supreme Court in *Von Raab* "gave indications that caution should be used in approving [the sensitive information] justification for testing." 878 F.2d at 492. Read, as it must be, to accord most fully with *Von Raab*, *Harmon* admits of one narrow interpretation only: except where the material in question is top secret and hence implicates a "core" governmental national security interest, drug testing programs designed to protect sensitive information are subject to *Von Raab*'s factual inquiry into all surrounding circumstances. The basis on which top secret is distinguished from other classified material is no longer before the court; however sound the distinction, *Harmon* made it law when it carved out from the Fourth Amendment balancing test a special exception for top secret information alone.

180

That the *Harmon* exception is so limited is made clear by this court's decision in *American Federation of Government Employees v. Skinner*, 885 F.2d 884 (D.C. Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1960, 109 L.Ed.2d 321 (1990) (*"AFGE"*). *AFGE* sustained as reasonable the random testing of Department of Transportation ("DOT") mail van drivers with secret as well as top secret security clearances only after conducting a fact-specific inquiry under the *Von Raab* balancing test. The governmental interest in protecting classified materials in DOT mail vans outweighs the privacy interests of DOT drivers not automatically or categorically, but in part because the drivers have regular access to the materials and in part because they operate with little supervision outside an office environment, making detection of drug use through means other than urinalysis testing more difficult. *See* 885 F.2d at 892–93. Had *Harmon* established the *per se* permissibility of testing secret clearance holders, the court in *AFGE* could have dispensed with its contextual analysis. But because the *Harmon* exception applies only to top secret clearances, the *AFGE* court properly subjected testing of drivers with secret clearances to the case-specific assessment mandated by *Von Raab*.

*AFGE*'s adherence to the *Von Raab* case-by-case balancing approach is to be expected; this court is, after all, bound by the Supreme Court's decision in *Von Raab*. And contrary to Judge Silberman's assertion, we have never believed that *Von Raab*'s directive can be satisfied by application of bright-line rules and "clear demarcation lines." As *Harmon* itself recognizes, *Von Raab* provides no "analytical rule by which legitimate drug-testing programs [can] be distinguished from illegitimate ones" that might substitute for performance of a multifactor balancing test. *See* 878 F.2d at 488. Further evidence of this court's commitment to the *Von Raab* balancing test is provided by *National Federation of Federal Employees v. Cheney*, 884 F.2d 603 (D.C.Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990), in which the court re-

fused to sustain on an insufficiently detailed record the random testing of Army civilian employees occupying chemical and nuclear surety positions. Despite the fact that the Army averred serious safety and national security interests in urinalysis testing, the court in *Cheney* found itself unable to assess the reasonableness of such testing on the record before it and remanded in accordance with *Von Raab*. 884 F.2d at 611–12.

The majority today departs from circuit precedent as well as from *Von Raab* when it creates a new exception to the Fourth Amendment balancing test for drug testing of secret clearance holders. And while Judge Mikva's concurring opinion explicitly limits today's holding to cases involving secret information, the reasoning offered by Judge Silberman admits of more expansive application. If *Harmon*, by its own terms limited to top secret clearance holders, can be read to establish the *per se* reasonableness of testing secret clearance holders, then it can be read to establish the reasonableness of testing confidential clearance holders, as well. Indeed, it is not self-evident that the reach of Judge Silberman's analysis stops short of federal employees with access to information unclassified but deemed "important" by the Government. Once expanded beyond its intended scope, the *Harmon* exception threatens to swallow the *Von Raab* rule, itself an exception to the constitutional mandate that searches be based on individualized suspicion, and render the Fourth Amendment essentially inapplicable whenever the Government invokes an interest in sensitive material to justify a drug testing regime.

Governing law does not permit such a result. Because *Harmon*'s *per se* rule does not extend beyond top secret clearance holders, the testing of EOP secret clearance holders is reasonable under the Fourth Amendment only if it satisfies *Von Raab*'s context-specific balancing test. Therefore, I would affirm the District Court order enjoining preliminarily the random testing of EOP employees with secret clearances. Whether the Government can

justify such testing as reasonable under all the circumstances should be determined by the District Court on a full factual record.

### III. CONCLUSION

This case is not the first Fourth Amendment casualty claimed by the War on Drugs. Nor, in all likelihood, will it be the last. We have dispensed already with the warrant and probable cause requirement in furtherance of the War on Drugs; indeed, in some cases, the Government has been allowed to conduct drug tests of its employees without any showing of individualized suspicion. And today, with respect to an entire class of federal employees, we relieve the Government of its obligation to justify testing as reasonable in light of all attendant circumstances. Even with no "real evidence of a real problem that will be solved by urine testing," *Von Raab,* 109 S.Ct. at 1399 (Scalia, J., dissenting), this minimal Fourth Amendment standard is dismissed as expendable in the heat of battle. As Justice Scalia said, "the Fourth Amendment has become frail protection indeed." *Id.* at 1400.

Times of crisis take the truest measure of our commitment to constitutional values. Constitutional rights are only as strong as our willingness to reaffirm them when they seem most costly to bear. I fear that today's decision finds us unwilling to do what we must to preserve fundamental Fourth Amendment freedoms. Respectfully, I dissent.