**Stephen D. FREEMAN, Lorraine A. Fairchild, Plaintiffs,**

**v.**

**Allen P. FALLIN et al., Defendants.**

**No. CIV.A.02–0386(RMU).**

United States District Court, District of Columbia.

Feb. 26, 2004.

Stephen Freeman, Norco, CA, Pro se.

Lorraine A. Fairchild, Norco, CA, Pro se.

Peter David Blumberg, U.S. Attorney's Office, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

URBINA, District Judge.

#### DENYING THE DEFENDANTS' MOTION TO ALTER OR AMEND JUDGMENT

### I. INTRODUCTION

This matter comes before the court on the defendants' motion to alter or amend the court's judgment pursuant to Federal Rule of Civil Procedure 59(e). *Pro se* plaintiffs Stephen Freeman and Lorraine Fairchild ("the plaintiffs") are former

criminal investigators with the Office of the Inspector General ("OIG") of the United States Environmental Protection Agency ("EPA"). The plaintiffs brought suit against several current and former OIG officials (collectively, "the defendants") in their individual capacities.[1] The plaintiffs claim that the defendants deprived them of their Fourth Amendment rights by subverting EPA's suspicionless drug testing procedures to gather evidence of alleged drug use for use in criminal proceedings. After the court denied the defendants' motion to dismiss, the defendants filed the pending motion. Because the court concludes that there is no intervening change of law, new evidence, or need to correct a clear error or prevent manifest injustice, the court denies the defendants' motion.

## II. BACKGROUND

The allegations set forth by the plaintiffs are as follows. From 1999 to 2000, both plaintiffs worked as criminal investigators for OIG, with Mr. Freeman in the San Francisco office and Ms. Fairchild in the District of Columbia office. *Freeman v. Fallin*, 254 F.Supp.2d 52, 54 (D.D.C.2003). As criminal investigators engaged in law enforcement and authorized to carry firearms, both plaintiffs were subject to random drug urinalysis testing. *Id.* According to the plaintiffs, at some time during fall 1999 and winter 2000, then-AIG for Investigations Fallin and Deputy AIG for Investigations Dashiell received what the plaintiffs describe as frivolous and unsubstantiated allegations concerning the plaintiffs' off-duty drug use. *Id.* The plaintiffs assert that AIG Fallin and Deputy AIG Dashiell then conferred with AIG for Management Jones, the coordinator for agency drug testing, to design a "random" drug test that would include the plaintiffs. *Id.*

Instead of following EPA policy by drawing a random sampling based on a neutral criterion, AIG Fallin allegedly chose last names beginning with the letter F, thereby ensuring that the plaintiffs would be among those tested. *Id.*

In February 2000, Ms. Fairchild received notice that she had been selected for random drug urinalysis testing. *Id.* Although Ms. Fairchild reported to the testing facility, she successfully evaded the test. *Id.* Unbeknownst to Ms. Fairchild, however, her efforts to evade the test allegedly were reported to AIG Fallin, Deputy AIG Dashiell, and AIG Jones. *Id.* The plaintiffs allege that AIG Dashiell subsequently asked Investigator Hymons to conduct an investigation. *Id.* In early March 2000, Investigator Hymons interviewed Ms. Fairchild's former boyfriend, who implicated Ms. Fairchild in drug use. *Id.* The following day, at a meeting between Investigator Hymons, AIG Jones, and OIG Counsel Bialek, AIG Jones indicated that both plaintiffs were scheduled to undergo testing, and OIG Counsel Bialek asked Investigator Hymons to present the matter to the U.S. Attorney. *Id.* at 54–55. Investigator Hymons allegedly briefed an assistant U.S. attorney ("AUSA") for the Southern District of Maryland, who indicated that he would make a decision regarding prosecution once the test results were available. *Id.* at 55.

During the next two weeks, both plaintiffs underwent urinalysis testing. In San Francisco, Mr. Freeman provided a sample without incident. *Id.* In the District of Columbia, Ms. Fairchild reported twice for testing, ultimately providing a sufficient sample. *Id.* In late March 2000, AIG Jones allegedly informed Investigator Hymons that test results for both plaintiffs were

---

1. The defendants are former OIG Assistant Inspector General ("AIG") for Investigations Allan Fallin, OIG Deputy AIG for Investigations Emmett Dashiell Jr., OIG AIG for Management John Jones, OIG Counsel to the Inspector General Mark Bialek, and Department of Defense Criminal Investigator Arthur Hymons. *See generally* Compl.

negative and Investigator Hymons reported the results to the AUSA, who indicated that he would not prosecute. *Id.*

Based on these events, the plaintiffs filed a complaint alleging that the defendants deprived them of their Fourth Amendment rights by subverting EPA's suspicionless drug testing procedures to gather evidence of alleged drug use for use in criminal proceedings. *Id.* In response, the defendants moved to dismiss for, *inter alia,* failure to state a claim on which relief may be granted. *Id.* Specifically, the defendants asserted that the plaintiffs failed to allege a violation of their constitutional rights, and raised a defense of qualified immunity. *Id.* at 59. The court denied the defendants' motion, concluding that the plaintiffs had alleged an actual Fourth Amendment right to protection against the use of agency suspicionless drug testing procedures to gather evidence for criminal proceedings, and that the right was clearly established at the time of the defendants' actions. *Id.* at 60–61.

Subsequently, the defendants filed the pending motion to alter or amend judgment, alleging that the court erred because "[i]t was not clearly established during 1999–2000[ ] that manipulation of random drug testing procedures to gather evidence of alleged drug use in criminal proceedings was a Fourth Amendment violation." Defs.' Mot. to Alter or Amend J. ("Defs.' Mot.") at 5. The court now turns to the defendants' motion.

### III. ANALYSIS

#### A. Legal Standards

##### 1. Rule 59(e) Motion to Alter or Amend Judgment

 Under Rule 59(e), a party may file a motion to alter or amend the court's

judgment within 10 days of entry of the judgment at issue.[2] FED. R. CIV. P. 59(e); *see also Mashpee Wampanoag Tribal Council, Inc. v. Norton,* 336 F.3d 1094, 1098 (D.C.Cir.2003) (discussing the measurement of the 10–day period). While the court has considerable discretion in ruling on a Rule 59(e) motion, the reconsideration and amendment of a previous order is an unusual measure. *Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C.Cir. 1996) *(per curiam )*; *McDowell v. Calderon,* 197 F.3d 1253, 1255 (9th Cir.1999). Rule 59(e) motions "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ciralsky v. Cent. Intelligence Agency,* 355 F.3d 661, 671 (D.C.Cir.2004) (quoting *Firestone,* 76 F.3d at 1208). Moreover, "[a] Rule 59(e) motion to reconsider is not simply an opportunity to reargue facts and theories upon which a court has already ruled," *New York v. United States,* 880 F.Supp. 37, 38 (D.D.C. 1995), or a vehicle for presenting theories or arguments that could have been raised previously. *Kattan v. District of Columbia,* 995 F.2d 274, 276 (D.C.Cir.1993); *W.C. & A.N. Miller Cos. v. United States,* 173 F.R.D. 1, 3 (D.D.C.1997).

##### 2. *Bivens* Claims and the Qualified Immunity Defense

A plaintiff may bring a civil action for money damages against a federal official in his or her individual capacity for violation of the plaintiff's constitutional rights. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388,

---

**2.** Because "[d]enial of a qualified immunity claim is ... appealable at once," the court's denial of the defendants' motion to dismiss constitutes a judgment for purposes of Rule 59(e). *Martin v. Malhoyt,* 830 F.2d 237, 246 (D.C.Cir.1987); FED. R. CIV. P. 54(a), 59(e).

389, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Federal officials, however, may be entitled to a defense of qualified immunity. *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity "shield[s officials] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* It "provides not simply a defense to liability, but also an entitlement not to stand trial or face the other burdens of litigation." *Farmer v. Moritsugu,* 163 F.3d 610, 613 (D.C.Cir.1998) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

In evaluating a *Bivens* claim to which a defendant has raised the qualified immunity defense, the court must follow a two-pronged analysis. *Butera v. District of Columbia,* 235 F.3d 637, 646 (D.C.Cir. 2001) (citing *Wilson,* 526 U.S. at 609, 119 S.Ct. 1692). First, as a threshold matter, the court must determine whether the plaintiff has alleged the deprivation of an actual constitutional right. *Id.; Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In defining an "actual constitutional right," a court must be careful to avoid defining the right in overly general terms "lest [it] strip the qualified immunity defense of all meaning." *Butera,* 235 F.3d at 646. Instead, the court must identify the right with the appropriate level of specificity so as to allow officials to reasonably anticipate when their conduct may give rise to liability for damages. *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Second, the court must decide whether the constitutional right was clearly established at the time of the defendant's action. *Id.* A right is "clearly established" if "the contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Wilson,* 526 U.S. at 614–15, 119 S.Ct. 1692); *see Crawford–El v. Britton,* 523 U.S. 574, 591, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (stating that "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct"). Although courts need not have held the specific action in question to be unlawful, the action's unlawfulness in light of pre-existing law must have been apparent to the defendant. *Butera,* 235 F.3d at 646 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034).

## B. The Court Denies the Defendants' Motion to Alter or Amend Judgment [3]

In their motion, the defendants contend that "[i]t was not clearly established during 1999–2000[ ] that manipulation of random drug testing procedures to gather evidence of alleged drug use in criminal proceedings was a Fourth Amendment violation." Defs.' Mot. at 5. Specifically, the defendants argue that there is no case law addressing whether manipulation of random drug testing procedures violates the Fourth Amendment. *Id.* at 8. Moreover, the defendants assert that "at least four Supreme Court Justices, in 2001, believed that the taking of a urine sample may not amount to a search in violation of the Fourth Amendment at all, even without any application of the special-needs

---

**3.** The defendants filed their motion within the 10–day window prescribed by Rule 59(e).

FED. R. CIV. P. 59(e).

doctrine." *Id.* at 10 (referring to *Ferguson v. City of Charleston,* 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001)). Noting that the defendants are not required to be constitutional scholars, the defendants urge the court to conclude that the applicable law was not clearly established at the time of the events alleged by the plaintiffs.[4] *Id.* at 12.

In response, the plaintiffs argue that the defendants' motion is a transparent attempt to relitigate old matters by raising arguments that they could have raised in their motion to dismiss. Pls.' Opp'n at 1. The plaintiffs go on to stress that "[t]he central issue remains whether police officers engaged in a criminal investigation can avoid the warrant and probable cause requirements of the Fourth Amendment by subverting a mandatory, administrative drug testing procedure to gather evidence of a crime," whether or not a criminal prosecution actually took place.[5] *Id.* at 3. In fact, the plaintiffs assert that they established a prima facie case of unreasonableness by alleging that the defendants did not randomly administer the drug test. *Id.* Finally, the plaintiffs argue that the defendants have a responsibility to keep abreast of constitutional developments in criminal law. *Id.*

The court concludes that there is no intervening change of law, new evidence, or need to correct a clear error or prevent manifest injustice that would warrant granting the defendants' motion. *Firestone,* 76 F.3d at 1208. At the time of the defendants' alleged actions in 1999–2000, there was no question that agencies could subject federal employees engaged in certain safety-sensitive tasks to suspicionless drug testing under the "special needs" doctrine. *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 679, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 624, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Hartness v. Bush,* 919 F.2d 170, 172 (D.C.Cir.1990). At the same time, the Supreme Court had made clear through a string of decisions issued in 1989, 1995, and 1997 that special-needs testing could not be undertaken for purposes of criminal prosecution. *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 658, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (noting that results from the school's drug-testing program were "not turned over to law enforcement authorities"); *Von Raab,*

---

4. In their reply, the defendants raise an additional argument that focuses on the sufficiency of the plaintiffs' allegations. Defs.' Reply at 3–8. Examining the chronology set forth in the complaint—and focusing only on Ms. Fairchild—the defendants state that "[t]he criminal/law enforcement nexus alleged by plaintiffs did not arise until *after* Ms. Fairchild attempted to evade her test," and thus that "the patent insufficiency of plaintiffs' claim of a constitutional violation becomes clear." *Id.* at 6–7. Not only is this argument raised for the first time in the defendants' reply, but it clearly is one that the defendants could have raised previously in their motion to dismiss. The court therefore declines to consider it. *Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 195 (D.C.Cir.1992); *Kattan,* 995 F.2d at 276; *W.C. & A.N. Miller Cos.,* 173 F.R.D. at 3.

5. The defendants initially stated that "there was no criminal investigation nor any criminal prosecution in this case," and that "at no time[ ] were drug test results provided to the United States Attorney's Office for criminal prosecution." Defs.' Mot. at 4. The plaintiffs disputed the defendants' statement, arguing that an affidavit by Investigator Hymons submitted in a related case shows that there was a criminal investigation. Pls.' Opp'n at 1–2. Subsequently, in a footnote in their reply, the defendants indicated that they "incorrectly stated that 'at no time were drug test results provided to the United States Attorneys' Office.'" Defs.' Reply at 2 n.2.

489 U.S. at 666, 109 S.Ct. 1384 (observing that under the Customs Service's drug-testing program, "[t]est results [could] not be used in a criminal prosecution of the employee without the employee's consent"); *Skinner*, 489 U.S. at 620–21, 109 S.Ct. 1402 (commenting that the Federal Railway Administration's drug-testing program was "not to assist in the prosecution of employees"); *cf. Chandler v. Miller*, 520 U.S. 305, 312, 318, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (stating with approval that Georgia's statute requiring drug testing for candidates for state office barred disclosure of test results to law enforcement, but striking down the statute for lack of a "special need" justification).

The defendants argue, however, that this case law does not define the constitutional right at the "appropriate level of specificity." Defs.' Mot. at 8–9 (citing *Wilson*, 526 U.S. at 615, 119 S.Ct. 1692). But the specificity requirement does not mean "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). In fact, the Supreme Court has "expressly rejected a requirement that previous cases be 'fundamentally similar,'" concluding that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741, 122 S.Ct. 2508. The question thus turns on whether "in the light of pre-existing law the unlawfulness [was] apparent." *Id.* at 739, 122 S.Ct. 2508 (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034). Accepting the plaintiffs' allegations as true, the court concludes that here, the state of the law certainly would have given the defendants fair warning that their actions were unconstitutional. *Id.* at 741, 122 S.Ct. 2508. In its string of decisions, the Court—whose binding precedent clearly "establishes" the law—made clear that the special-needs doctrine permits suspicionless drug testing of certain employees by agencies as long as the testing is performed for reasons unrelated to law enforcement. *Hobson v. Wilson*, 737 F.2d 1, 26 (D.C.Cir.1984), *overruled in part on other grounds*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Ferguson v. City of Charleston*, 532 U.S. 67, 79–80 n. 15, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). For example, in *Von Raab*, the Court upheld the Custom Service's drug testing program for employees required to carry firearms because the program "[was] not designed to serve the ordinary needs of law enforcement." *Von Raab*, 489 U.S. at 664–65, 109 S.Ct. 1384. Against this background, and given the similarity between the Customs Service program and the defendants' urinalysis program, the unlawfulness of the defendants' alleged actions in 1999–2000 should have been "apparent" to the defendants.[6] *Hope*, 536 U.S. at 739, 122 S.Ct. 2508.

---

**6.** In arguing that the law was not clearly established, the defendants make much of the fact that in *Ferguson*—the 2001 decision in which the Court reviewed its special-needs cases—Justice Kennedy filed a concurring opinion and Justice Scalia filed a dissenting opinion in which Chief Justice Rehnquist and Justice Thomas joined in part. Defs.' Mot. at 9 (citing *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001)). First, the defendants argue that "at least four Supreme Court Justices, in 2001, believed that the taking of a urine sample may not amount to a search in violation of the Fourth Amendment at all," implying that the law does not clearly establish that the urinalysis testing at issue here qualifies as a search. *Id.* at 10. Perhaps recognizing the weakness of that argument, the defendants modify this argument in their reply, asserting that "[a]ny fair reading of the *Ferguson* opinion shows that the area of the interplay between 'special needs' searches and law enforcement is one that was and remains, to say the least, fraught with difficulty and still elicits diverse opinions

18

## IV. CONCLUSION

For the foregoing reasons, the court denies the defendants' motion to alter or amend judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 26th day of February, 2004.

from the justices of the Supreme Court." Defs.' Reply at 8. Assuming that the defendants present this modified argument to support their initial argument that the law was not clearly established, the court notes that the law may be clearly established notwithstanding the presence of "diverse" opinions among the justices. *E.g., Hobson,* 737 F.2d at 28 (citing *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961), a 5–4 Supreme Court decision, as establishing that under the First Amendment the government cannot punish a person for membership in any organization absent proof that the person intends to accomplish the organization's illegal aims).